IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CV-637-FL

| | | |
|---|---|---|
| LARRY MCKINNEY and JENNY MCKINNEY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| NATIONSTAR MORTGAGE, LLC, and SUBSTITUTE TRUSTEE SERVICES, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

This matter is before the court on the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (DE 23) filed by defendant Nationstar Mortgage, LLC (hereinafter "defendant"). Plaintiffs responded and defendant replied. In this posture, the issues raised are ripe for ruling. For the following reasons, the court grants in part and denies in part the motion.

## BACKGROUND

Plaintiffs commenced this action on November 6, 2015, in Cumberland County Superior Court, and defendant removed the action to this court on December 7, 2015.[1] Plaintiffs filed an amended complaint on January 4, 2016, asserting breach of contract, state law tort and common law claims, as well as statutory claims, arising out of a repayment plan on a mortgage loan secured by plaintiffs' residence. Defendant filed the instant motion on January 21, 2016, arguing that plaintiffs'

---

[1] In the notice of removal, defendant notes that the second-named defendant, Substitute Trustee Services, Inc., ("Substitute Trustee") is a nominal defendant, against whom no factual allegations or claims are raised, to be disregarded for purposes of determining diversity jurisdiction. Plaintiffs name Substitute Trustee only insofar as relief sought may concern foreclosure of a deed of trust. (Compl. ¶5; see Am. Compl. ¶10).

claims fail as a matter of law. Defendant attaches to its motion the underlying mortgage loan documentation, comprising a note and deed of trust. On January 25, 2016, the court stayed case scheduling activities pending resolution of the instant motion.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiffs executed a note and deed of trust on May 9, 2006, in the principal amount of $82,577.00, secured by plaintiffs' residence in Hope Mills, North Carolina. The note is in the form of a home equity line of credit agreement with American General Financial Services, Inc. ("American General"), under which plaintiffs were to able make initial and subsequent draws, with the obligation to make minimum monthly payments calculated on the basis of a finance charge. The finance charge was calculated under the note by applying a daily periodic rate of .026% (corresponding to a 9.5% annual percentage rate), to an average daily balance figure, then multiplying the resulting product by the number of days in a billing cycle. Defendant is the current holder of the note.

In October 2014, plaintiff Larry McKinney contracted diverticulosis, a debilitating, excruciatingly-painful medically diagnosed condition affecting the bowel rendering him unable to perform any meaningful job or task or otherwise earn income during such time and several months thereafter. Defendant was aware at that time of plaintiff Larry McKinney's debilitating condition, his status as bread-winner in the household, and of his repeated hospitalization around February 2015 with his condition again inflaming and rendering him physically unable to perform day-to-day tasks and maintain his employment at normal or light duty levels.

Plaintiffs defaulted on the note sometime after October 2014. In April 2015, defendant offered plaintiffs a "Repayment Plan" that was intended to "allow [plaintiffs] to pay down the

2

delinquent amount over time and stay in [their] home." (DE 19-2). The Repayment Plan provided for defendant to accept payments from plaintiffs in the amount of $1,467.60 per month for six months, on April 1, 2015; May 1, 2015; June 1, 2015; July 1, 2015; August 1, 2015; and September 1, 2015; resulting at the end of the Repayment Plan in a deficiency balance on the note of $6.35. In return for such payments, defendant agreed to bring plaintiffs current on the note and return plaintiffs' minimum monthly payments to regularly scheduled amounts.

Plaintiffs accepted the offer of the Repayment Plan and made a first payment under the Repayment Plan on April 1, 2015, by telephone, in the amount of $1,501.02, which defendant accepted. Plaintiffs made a second payment under the Repayment Plan on May 1, 2015, by telephone, in the amount of $1,467.60, which defendant accepted. Plaintiffs made a third payment under the Repayment Plan on June 1, 2015, by telephone, in the amount of $1,467.60, which defendant did not immediately accept but rather marked as "unapplied" on a subsequent written statement. (DE 19 ¶ 55). Plaintiffs attempted to make a fourth payment under the Repayment Plan on July 2, 2015, by telephone, which defendant refused to accept.

Defendant informed plaintiffs at that time that the Repayment Plan was established improperly, and that the Repayment Plan did not comply with requirements of the note. Defendant refused to continue with the Repayment Plan and threatened proceed to foreclosure if the total delinquent amounts were not paid. Defendant offered plaintiffs an alternative of new repayment options calling for higher monthly payment amounts, to which plaintiffs did not agree.

On July 23, 2015, defendant sent plaintiffs a letter informing plaintiffs that they were in default on the note and that plaintiffs must pay $3,752.05 to cure the default. The letter states that failure to pay this amount "may result in acceleration of the sums secured by the [deed of trust],

3

foreclosure proceedings[,] and sale of the property." (DE 19-21 at 2). On August 12, 2015, defendant stated that the amount due was $5,202.81. (DE 19-22). On August 13, 2015, defendant demanded payment of $8,878.79 "to bring [the] loan current." (DE 19-23). Defendant's representative also visited plaintiff's residence monthly, engaging in conduct including repeatedly taking pictures and "waltzing up the Plaintiffs' front yard and hanging a conspicuous door tag." (DE 19 ¶82).

## COURT'S DISCUSSION

A.   Standard of Review

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a claim but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556.

In evaluating a claim, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). When a document is attached to a motion to dismiss, "a court may consider it in determining whether to dismiss the complaint if it was

4

integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (quotations omitted).

B.  Analysis

    1.  Breach of Contract

Plaintiffs seek damages based upon defendant's abandonment of the Repayment Plan. Defendant argues that this claim should be dismissed as a matter of law because the Repayment Plan is not supported by consideration and thus not a valid contract.

Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir. 2011) (quotations omitted). Under North Carolina law, to constitute a valid contract, "the parties must assent to the same thing in the same sense, and their minds must meet as to all the terms." Boyce v. McMahan, 285 N.C. 730, 734 (1974). In addition, "in order for a contract to be enforceable it must be supported by consideration." Investment Properties of Asheville, Inc. v. Norburn, 281 N.C. 191, 195 (1972). "A mere promise, without more, is unenforceable." Id.

"[C]onsideration may present itself in any of numerous different shapes or guises, but in some form or other it must be present – there must be either some advantage, or presumed or assumed advantage, accruing to party who yields his claim, or some detriment to the other party." Bizzell v. Bizzell, 247 N.C. 590, 603 (1958). Consideration may be "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 215 (1981).

5

"[T]here is a consideration if the promisee, in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has a right to do, whether there is any actual loss or detriment to him or actual benefit to the promisor or not." Stonestreet v. S. Oil Co., 226 N.C. 261, 263 (1946) (quotations omitted). "Consideration for a promise is defined . . . as an act or a forbearance, or the creation, modification or destruction of a legal relation, or a return promise, bargained for and given in exchange for the promise." Byerly v. Duke Power Co., 217 F.2d 803, 806 (4th Cir. 1954) (citing Restatement of Contracts § 75) (applying North Carolina law).

Defendant argues that there was no consideration on plaintiffs' part for the Repayment Plan because plaintiffs did not promise a new benefit or assume any new detriment, where they already owed defendant past-due payments under the note. Defendant's argument is flawed, however, because it fails to account for plaintiffs' new alleged promise under the Repayment Plan to make monthly payments in a different, higher, monthly amount than the regular payment amount, over a specific six-month time period. As such, while plaintiffs did owe past-due amounts, they had not agreed to repay them, prior to the commencement of the Repayment Plan, on a specific monthly schedule, in an amount higher than the regular payment amount. While this consideration in the form of a modified monthly payment is minimal in comparison to the forbearance offered by defendant, it is nonetheless a promise to do something which plaintiffs were not obligated to do each month under the terms of the note, at the time of their entry into the Repayment Plan.

In particular, the note required plaintiffs each month to "pay at least the Minimum Payment shown on each of [their] Monthly Statements by the payment due date." (DE 23-2). For example, plaintiffs' June monthly statement provided that the minimum payment due July 1, 2015, was

6

$928.34. (DE 19-18). By contrast, the Repayment Plan provided for plaintiffs to make a payment on July 1, 2015, in the amount of $1,467.60. (DE 19-2 at 2). Accordingly, such increased monthly payment amount constituted valid consideration for the Repayment Plan.

In addition, while plaintiffs were in default on the note, such default alone did not obligate plaintiffs to proceed with monthly payments in the amount, manner, or frequency as specified in the Repayment Plan. In fact, the note provides defendant with certain rights upon default, but it does not obligate plaintiffs to make monthly payments in the amount specified in the Repayment Plan, or any additional payment amount at all unless demanded to do so. Specifically, the note provides, upon default:

> Lender <u>may</u>, subject to providing required notices and right to cure: (a) prohibit Subsequent Draws and; (b) reduce my Credit Limit and; (c) close my Account and require me to pay Lender the Total Balance right away and; (d) foreclose on my Property . . . .
>
> Lender <u>may</u> close my Account and require me to pay the Total Balance immediately, after providing me any notice of default and opportunity to cure required by applicable law. If I am in default, Lender first <u>may choose</u> to take other action, such as prohibiting Subsequent Draws or reducing my Credit Limit; however, unless Lender reinstates my Account, Lender does not give up Lender's <u>right to</u> close my Account and require me to pay Lender the Total Balance immediately, even if I do not default again. <u>If</u> Lender closes my Account and requires me to pay Lender the Total Balance right away, I must pay the Total Balance I owe Lender immediately.

(DE 23-2 at 6). At the time of entry into the Repayment Plan, there was thus no requirement for plaintiffs to pay their past due amount immediately under the terms of the note, unless defendant elected one of the aforementioned remedies for default. (<u>See</u> <u>id.</u>). At the time of entry into the Repayment Plan, as alleged by plaintiffs, defendant did not elect any such remedy, but rather agreed to enter into the Repayment Plan. (DE 19 ¶¶ 15-25).

Defendant cites to Penn Compression Moulding v. Mar-Bal, Inc., 73 N.C. App. 291, 294 (1985), for the proposition that a renewed promise to pay a "pre-existing debt" is not consideration. Penn Compression, however, is instructively distinguishable. There, the plaintiff owed defendant a business debt in the amount due of $13,568.25, for invoices on goods received. The plaintiff alleged an additional contract was formed wherein the plaintiff promised to pay the overdue amount in return for a promise by the defendant to pay a commission on other services rendered. The court held that the additional alleged contract was invalid because it was not supported by consideration, where the plaintiff "was already under an obligation to pay defendant on its overdue account." Penn Compression, 73 N.C. App. at 294.

Penn Compression is distinguishable from the instant case in the key respect that the plaintiff there owed defendant a single sum of $13,568.25, with no monthly payment terms or special default terms noted. In the instant case, by contrast, plaintiffs' obligations are governed by the terms of the note, under which plaintiffs are obligated to pay a certain minimum monthly amount. Additional rights and obligations govern in the case of default. Accordingly, while a simple reduction in the obligation in Penn Compression could not constitute consideration, a change in the monthly payment obligation in the instant case does constitute consideration.

In so holding, the court expresses no opinion on the ultimate merits of plaintiffs' breach of contract claim, or on other defenses that may be asserted by defendant not before the court at this time. It suffices at this juncture that defendant's argument as to lack of consideration, viewing the allegations in the complaint in the light most favorable to plaintiff, is without merit. Therefore plaintiffs' breach of contract claim is allowed to proceed.

2. Abandoned Claims

Plaintiffs expressly abandon several claims in their response to the motion to dismiss. These claims are conversion (second claim); unjust enrichment (third claim); negligence (fifteenth claim); and constructive trust (twentieth claim). In addition, plaintiffs concede that they do not seek to state a cause of action under the North Carolina Mortgage Debt Collection and Servicing Act (twelfth claim). Likewise, plaintiffs concede that their equitable estoppel claim (sixteenth claim) is asserted as a defense to foreclosure, not an affirmative claim for relief. Therefore, these claims are dismissed without prejudice.

3. Tort Claims

Plaintiffs assert a number of tort claims on the basis of North Carolina common law and statutes. These claims are reckless, intentional, and negligent infliction of emotional distress (sixth, seventh, and eighth claims); fraud and negligent representation (ninth, tenth, and eleventh claims); and unfair or deceptive trade practices (fourteenth claim).

Where a cause of action presumes the "existence of an agreement, the terms contained in an agreement, and the interpretation of an agreement," the issues raised must be relegated to the arena of contract law, and are not appropriate for resolution under tort principles. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 347 (4th Cir. 1998). Under North Carolina law, the court must "limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim." Id. at 346 (quoting Newton v. Standard Fire Ins. Co., 291 N.C. 105, 111 (1976)). Furthermore, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." Strum v. Exxon Co.,

9

U.S.A., 15 F.3d 327, 333 (4th Cir. 1994); see N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 83 (1978) ("[O]ur research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill.").

Here, plaintiffs' claims are premised on defendant's failure to perform as promised or earlier represented, causing plaintiffs emotional distress and other tort injuries. Because these alleged tort injuries arise from defendant's failure to perform under the alleged contract, plaintiffs' claims are most appropriately addressed through a claim for breach of contract. The alleged mistakes and incompetence on the part of representatives of defendant's in allegedly offering the Repayment Plan as proposed, and lack of explanation and manner in which they failed to carry through with such Repayment Plan, are not independent of defendant's failure to perform under the alleged contract. As such, plaintiffs' tort claims must be dismissed as a matter of law.

In any event, plaintiffs have failed to allege facts supporting their tort claims. A party must allege "substantial aggravating circumstances" to support a claim for unfair and deceptive business practices. Broussard, 155 F.3d at 347 (citations omitted); see Ellis v. Louisiana-Pac. Corp., 699 F.3d 778, 787 (4th Cir. 2012) ("Egregious or aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect.") (citation omitted). Here, the alleged conduct by defendant – either before or after setting up the Repayment Plan – does not comprise egregious or aggravating circumstances that would bring these allegations into the realm of unfair or deceptive trade practices. See Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535–36 (4th Cir.1989) (finding that substantial aggravating circumstances did not exist where plaintiff's employer allegedly breached an oral agreement by "deceiv[ing]" him about the status of his distributorship, as that claim

10

was "at most, [a] simple breach[ ] of contract"); see also Big Red, LLC v. Davines S.P.A., 31 Fed.Appx. 216, 225 (4th Cir. 2002) (holding that manufacturer did not engage in sufficiently egregious conduct to trigger unfair trade practices statute when it did not finalize alleged oral agreement, and instead entered into written agreement with another distributor); Curtis B. Pearson Music Co. v. Everitt, 368 Fed.Appx. 450, 456 (4th Cir. 2010) ("Misunderstandings, despite their capacity to deceive, ordinarily are insufficient to sustain a claim of deceptive conduct under the UDTPA." ).

To state a claim for intentional infliction of emotional distress, plaintiffs must allege: "1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." Waddle v. Sparks, 331 N.C. 73, 82 (1992). To state a claim for negligent infliction of emotional distress, plaintiffs must allege that: "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, and (3) the conduct did in fact cause the plaintiff severe emotional distress." Hickman By & Through Womble v. McKoin, 337 N.C. 460, 462 (1994). "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Waddle, 331 N.C. at 84. Here plaintiffs have not alleged either extreme and outrageous conduct, or conduct that was reasonably foreseeable to cause plaintiffs severe emotional distress. Accordingly, plaintiffs' claims on the basis of emotional distress must be dismissed.

In order to state a claim for fraud or intentional misrepresentation under North Carolina law, plaintiffs must plead with particularity facts showing (1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party. Forbis v. Neal, 361 N.C. 519, 526-27

11

(2007). Here, the alleged false representations by defendant asserted in count nine of the complaint are representations about future conduct, particularly its acceptance of payments under the Repayment Plan (see DE 19 ¶113), and are thus unactionable as a matter of law. See Gadsden v. Johnson, 261 N.C. 743, 747 (1964).

Plaintiffs also claim that defendant committed fraud and negligent misrepresentation, where defendant had a duty to supply correct information to plaintiffs about the Repayment Plan (DE 19 ¶ 127) and information about "HAMP modification" programs (DE 19 ¶120). The tort of negligent misrepresentation requires an allegation that defendant owed plaintiffs a "duty of care." Dallaire v. Bank of Am., N.A., 367 N.C. 363, 369 (2014). Fraud based upon concealment also requires a duty to disclose. Griffin v. Wheeler-Leonard & Co., 290 N.C. 185, 198 (1976). Here, however, the parties' relationship as borrower-lender does not create such duties, as "borrowers and lenders are generally bound only by the terms of their contract and the Uniform Commercial Code." Dallaire, 367 N.C. at 368. Plaintiffs suggest that defendant had a duty to disclose "HAMP modification" programs, in reference to the Home Affordable Modification Program, a United States Department of Treasury Program created under the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §§ 5201-5261. That program and its implementing statutes, however, does not create obligations enforceable by a private plaintiff in civil suit against a lender defendant as here. See Spaulding v. Wells Fargo Bank, N.A., 714 F.3d 769, 775 (4th Cir. 2013).

In sum, plaintiffs' common law tort claims must be dismissed as a matter of law.

4.  North Carolina Debt Collection Act

Plaintiffs claim defendant violated the North Carolina Debt Collection Act (NCDCA), which prohibits unfair, deceptive, or fraudulent practices in the collection of debts. See N.C. Gen. Stat.

12

§ 75-51. To state such a claim, however, plaintiffs must allege facts meeting the requirements of an unfair or deceptive trade practices claim. See Ross v. Washington Mut. Bank, 566 F. Supp. 2d 468, 479 (E.D.N.C. 2008). Where the court determined above that plaintiffs failed to allege an unfair or deceptive trade practices claim, plaintiffs' claim under the NCDCA also fails as a matter of law.

     5.     Fair Debt Collection Practices Act

Plaintiffs claim that defendant violated the FDCPA, 15 U.S.C. §§ 1601 et seq., by engaging in conduct to harass, oppress, or abuse them in connection with collection of a debt; making a false or misleading representation in connection with collection of a debt; and engaging in unfair or unconscionable means to collect or attempt to collect a debt.

Congress enacted the FDCPA with the purpose "to eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(a). "The term 'debt collector' means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C.A. § 1692a(6). The term does not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person." Id. § 1692a(6)(F) (emphasis added).

Defendant argues that it is not a debt collector under the meaning of the FDCPA because plaintiffs do not allege that they were in default prior to the time defendant obtained the instant note. While plaintiffs do not state a specific date when they were in default on the instant note, plaintiffs suggest that they were in default at the earliest in October 2014, when plaintiff Larry McKinney contracted diverticulosis and was unable to earn income. (DE 19 ¶12). Plaintiffs also do not state

13

in the complaint a specific date when defendant acquired the note. Plaintiffs suggest, however, that defendant may have acquired the note at some later point in time, as late as July 15, 2015, upon an assignment of the note and deed of trust. (Id. ¶¶ 8-9). Accordingly, viewing the allegations in the light most favorable to plaintiffs, defendant attempted to collect on the note, where such note was in default at the time defendant obtained it. Thus, defendant's argument in support of dismissal on this basis at this juncture is without merit.

Defendant also argues that plaintiffs' FDCPA claim must be dismissed because the complaint fails to put defendant on notice as to what specific conduct allegedly violated the FDCPA. Here, plaintiffs allege only generally statutory language in setting forth their FDCPA claim. (DE 19 ¶¶ 96-98). Nevertheless, the complaint includes a number of factual allegations regarding conduct by defendant and its representatives, which plaintiffs characterize in their complaint as unfair acts or false statements. While these allegations are set forth under the heading of plaintiffs' NCDCA claim, the FDCPA claim incorporates prior allegations. Accordingly, the court will review whether such allegations state a claim under the FDCPA.

Section 1692d of the FDCPA prohibits debt collectors from engaging in conduct "the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Similarly, section 1692f prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. §1692f. Section 1692e prohibits a debt collector from using "false, deceptive, or misleading representation or means in connection with the collection of any debt," such as making a false representation as to a debt's "character, amount, or legal status." § 1692e(2)(A). "[T]he FDCPA imposes liability without proof of an intentional violation," although affirmative defenses to liability are provided in

14

the statute. Warren v. Sessoms & Rogers, P.A., 676 F.3d 365, 375 (4th Cir.2012) (quotations omitted); see Joy v. Merscorp, Inc., 935 F. Supp. 2d 848, 857 (E.D.N.C. 2013).

Here, plaintiffs have at a minimum alleged a violation of the prohibition in §1692e against false or misleading representations as to the "character, amount, or legal status" of a debt. Plaintiffs allege that defendant "made false accusations to multiple credit reporting agencies that the Plaintiffs had not paid or has willfully refused to pay a just debt," amounting to a misleading representation as to the character, amount, and status of the amounts due, in light of the Repayment Plan. (DE 19 ¶ 83). On the same premise, plaintiffs allege that defendant communicated to them false information about the amounts due and payable, as well as fees and charges payable, in communications sent within a short time frame in July and August, 2015. (DE 19 ¶¶78-79, 88-89).

Plaintiffs also allege a claim, though more marginally, on the basis of conduct of a certain representative of defendant. Plaintiffs allege "a field services agent . . . monthly passed the residence, parked, . . . snapp[ed] pictures from the right of way and the Plaintiffs' shoulder of the right of way, and thence waltz[ed] up the Plaintiffs' front yard and [hung] a conspicuous door tag instructing the Plaintiffs to call their mortgage company, all in broad daylight for the neighbors to see." (DE 19 at ¶82). Plaintiffs suggest that this conduct repeated numerous times to present. (Id.). Drawing all inferences in plaintiffs' favor regarding the manner in which the representative "waltzed" up plaintiffs' front yard, and the apparently unnecessary frequency and conspicuousness of visits, these allegations state a plausible claim under § 1692d. See Harvey v. Great Seneca Fin. Corp., 453 F.3d 324, 330 (6th Cir. 2006) (stating that 1692d concerns "tactics intended to embarrass . . . a debtor").

15

In so holding, the court does not address all potential issues or arguments regarding plaintiffs' FDCPA claim or potential defenses thereto, which are not now before the court. It suffices that the arguments raised by defendant in its motion to dismiss are not availing to result in dismissal of the FDCPA claim as a matter of law at this juncture.

6. Breach of Implied Duty of Good Faith

Plaintiffs claim that defendant breached an implied duty of good faith and fair duty by violating various government guidelines and regulations concerning "loss mitigation measures." (DE 19 ¶148).

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985). "It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C. App. 743, 746 (1979).

In this manner, a claim for "breach of the covenant of good faith and fair dealing is part and parcel of [a] claim for breach of contract." Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000). "[T]he implied duty of good faith and fair dealing only arises where a party to a contract performs its contractual obligations in bad faith, and such breach of the implied duty serves as a cognizable basis for a breach of contract." Suntrust Mortgage, Inc. v. Busby, 651 F. Supp. 2d 472, 487 (W.D.N.C. 2009).

Here, the grounds asserted for plaintiffs' breach of implied duty claim are insufficient as a matter of law to support such claim. Plaintiffs suggest defendant violated various laws, guidelines,

16

and regulations (hereinafter "government directives") by not offering additional "loss mitigation measures" to plaintiffs. Plaintiffs do not allege, however, that offering loss mitigation measures was a requirement of either the Repayment Plan or the note ether as implied or expressly provided. As alleged, the Repayment Plan does not suggest defendant must undertake additional loss mitigation duties towards plaintiffs, and the note similarly does not suggest defendant must do so. Rather, as alleged, the Repayment Plan's terms require defendant to accept payments on the schedule set forth in the Repayment Plan, and plaintiffs allege a failure by defendant to do so. Therefore, where provision of additional loss mitigation measures is not an express or implied duty in the Repayment Plan or the note, plaintiffs' claim of breach of implied duty on this basis must be dismissed as a matter of law.

7. Injunctive Relief

Plaintiffs seek preliminary injunctive relief preventing a foreclosure of their home. (DE 19 at 167-175). Plaintiffs also seek permanent injunctive relief directing defendant "to reconcile its reporting to the major credit bureaus in accord with the lawful debts (if any) due to said [defendant] at any given time that it made such a report." (DE 19 at 177).

Where plaintiffs' breach of contract and FDCPA claims are allowed to proceed, the court also allows plaintiffs' claim for permanent injunctive relief to proceed as a component of such claims. However, the final determination of the appropriate remedy for such claims shall be made after determination of liability is complete. See N. Carolina Farm P'ship v. Pig Improvement Co., 163 N.C. App. 318, 324 (2004) ("[E]quitable relief such as an injunction is generally not granted due to breach of contract when an adequate remedy at law for money damages is available.") (emphasis added); Vitullo v. Mancini, 684 F. Supp. 2d 760, 762 (E.D. Va. 2010) ("Whether such

17

[injunctive] relief is available [under the FDCPA] is a question that has not been addressed by the Fourth Circuit."); see also Weiss v. Regal Collections, 385 F.3d 337 (3rd Cir.2004) ("Most courts have found equitable relief unavailable under the [FDCPA], at least with respect to private actions.").

Furthermore, preliminary injunctive relief is not warranted at this juncture. As an initial matter, plaintiffs have not moved for a preliminary injunction. See Fed. R. Civ. P. 65(a)(2) & (b)(3); Local Civil Rule 7.1(b) & (d). Furthermore, plaintiffs have not shown a likelihood of success on this claim, due to the lack of authority for injunctive relief generally based on the remaining claims, as well as lack of authority for a federal court enjoining state court foreclosure proceedings particularly. See, e.g., Reaves v. Seterus, Inc., No. 5:15-CV-33-FL, 2015 WL 965824, at *2 (E.D.N.C. Mar. 4, 2015) ("[A]n injunction issuing from this court against a state official is not in the public interest, where plaintiff has a full and fair opportunity to be heard before the [state court]."); Earquhart v. Witlatch, No. 5:14-CV-248-FL, 2015 WL 965817, at *2 (E.D.N.C. Mar. 4, 2015) (reasoning that Younger abstention requires the court to refrain from interference with pending state court civil proceedings related to the foreclosure); Carmichael v. Irwin Mortgage Corp., No. 5:14-CV-122-D, 2014 WL 7205099, at *4 (E.D.N.C. Dec. 17, 2014) ("[I]f plaintiffs want[] to enjoin the foreclosure sale, they need[] to bring an action in North Carolina Superior Court under N.C. Gen. Stat. § 45-21.34."). Accordingly, plaintiffs' claim for preliminary injunctive relief must be dismissed.

8. Punitive Damages

Plaintiffs seek punitive damages in their nineteenth claim for relief. However, "[p]unitive damages shall not be awarded against a person solely for breach of contract." N.C. Gen. Stat. § 1D-

15(d). In addition, punitive damages are not available for a violation of the FDCPA. See 15 U.S.C. § 1692k(a); see also Randolph v. IMBS, Inc., 368 F.3d 726, 728 (7th Cir. 2004) ("[V]iolations of the FDCPA . . . lead . . . never to punitive damages."). Therefore, plaintiffs' claim for punitive damages must be dismissed.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss (DE 23) is GRANTED IN PART and DENIED IN PART. Plaintiffs' claims for breach of contract (first claim), claim for violations of the FDCPA (fifth claim), and claim for permanent injunctive relief (eighteenth claim), are allowed to proceed. Plaintiffs' remaining claims are DISMISSED. An initial order regarding scheduling will follow.

SO ORDERED, this the 1st day of July, 2016.

_____
LOUISE W. FLANAGAN
United States District Judge